THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JESSIE LOPEZ *et al.*, Defendants-Appellants.

First District (5th Division)    No. 79-1384

Opinion filed January 30, 1981.—Rehearing denied February 27, 1981.

Robert Grossman, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Thomas J. Leanse, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendants Jessie Lopez and Ruben Mendiola were charged by information with the offenses of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), attempt armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 8—4), and unlawful use of weapons (Ill. Rev. Stat. 1975, ch. 38, par. 24—1(a)(7)). Following a bench trial, defendant Lopez was found guilty of armed robbery and unlawful use of weapons and was sentenced to periods of six and two years imprisonment respectively, with the sentences to run concurrently. Defendant Mendiola was found guilty of armed robbery and was sentenced to a period of six years imprisonment. On appeal, they contend that: (1) the trial court erred in denying their motion to suppress statements made by them; (2) the trial court erred in denying their motion to suppress identification testimony resulting from an unnecessary suggestive lineup procedure; and (3) the State failed to prove them guilty beyond a reasonable doubt.

On March 1, 1977, at around 1 a.m., Ghanshyam Patel and Vivian Becker closed for the evening the Convenient Food Store, where they worked. After locking the front door, they went through the side gangway to the rear parking lot. Patel was carrying a bag of groceries and the store's business records. As they reached Becker's car, three men approached them. Two of the men were identified by Patel as defendants Lopez and Mendiola. Lopez was carrying a sawed-off shotgun and was wearing a beige coat. Mendiola was wearing a black leather coat and held a small automatic weapon. The third individual stood approximately 10 to 12 feet from Patel and was not identified by either victim. Defendants, however, were standing two feet from Patel. The area was illuminated by

the lights from the front of the store, an overhead light from the building next door, street lights and lights on a nearby "El" station.

Defendant Lopez told them this was a stickup, and Ms. Becker began screaming. When Mendiola said, "This is a hold-up," she continued screaming and began running down the alley and out onto the street where she was picked up by the occupants of a passing automobile and taken to the police station.

Defendants ordered Patel to raise his hands and turn around facing away from them. They took his wallet, which contained $20, his store records and the bag of groceries, and then they fled down the alley. Patel estimated that "everything happened within two minutes." When he felt the defendants were gone, Patel went to the front of the store and flagged down a police car. He was then taken to the police station.

At the time of this occurrence, Chicago Police Officer Patrick Battaglia and his partner, Officer Paul Carroll, were on routine patrol in the squad car near the Convenient Food Store. They heard a woman screaming for help and began to tour the area. Almost immediately, Officer Battaglia observed a black and white Chrysler, with the motor running and the lights off, parked facing north in the alley behind the Convenient Food Store. Inside the car, a man, Evaristo Jiminez, and a woman, Lulu Torres, were in the front seat. Although the police officers did not stop to speak with the occupants of the car, Battaglia did write down the license plate number of the car. At that moment, Battaglia saw an individual running down the alley behind the Convenient Food Store. The police officers apprehended this man, who was later identified as Gene Cisneros. While arresting Cisneros, Battaglia saw a yellow Ford Maverick, with the lights off, parked at the north end of the alley. Battaglia spoke with Anita Ortiz and Adam Lopez, who were inside the Maverick, and then arrested them. Those two along with Gene Cisneros were transported to the police station.

At the police station, Battaglia again spoke with Anita Ortiz and Adam Lopez and then proceeded to an address on the south side of Chicago. At this location he saw the same black and white Chrysler which he had previously seen at the south end of the alley behind the Convenient Food Store. Battaglia and other officers entered the home at this address and arrested the defendants, along with Evaristo Jiminez, Michael Torres, and Lulu Torres. The defendants were informed of their rights at this time. Later, Battaglia, accompanied by Michael Torres and Evaristo Jiminez, went to another house where he obtained a pistol and a sawed-off shotgun.

After the robbery, Patel told the police that both men with the guns were approximately five feet, three inches tall, weighed 130 to 140 pounds, and were 17 to 18 years old. Later at the police station, Patel told

Battaglia that the man armed with the shotgun wore a beige coat and the man brandishing the automatic pistol wore a black leather coat. Officer Carroll testified that both Patel and Ms. Becker told him at the police station that three men accosted them, but only two had guns. Officer Carroll's police report, however, indicated that two men were involved in the robbery.

Approximately three hours after the robbery, Ms. Becker and Patel were asked to view a lineup. Sometime prior to the lineup, Battaglia told Patel that he had three people from the area in custody for questioning. The lineup, conducted by Investigator Fornelli, consisted of six individuals: the two defendants, and Michael Torres, Adam Lopez, Evaristo Jiminez and Gene Cisneros. Ms. Becker was unable to identify any participant in the lineup because, in her words, she was "so sick" and "too scared." Patel was standing behind Ms. Becker when she viewed the lineup, but did not hear her identify anyone in the lineup. Patel was then asked to view the lineup, and he identified the defendants who were located at both ends of the lineup. Patel and Ms. Becker were then taken to another room in the police station. At trial, Patel identified defendants as the men who robbed him and the guns recovered by Officer Battaglia as the weapons used by the defendants.

After the lineup, Investigator Fornelli informed the defendants of their rights and that they were charged with armed robbery. Defendants told Investigator Fornelli that they wanted to apologize to Patel. As they passed the room containing Patel and Ms. Becker, they stopped and, according to Battaglia, they said, "[S]orry, we'd like to give you your $20 back." According to Patel, defendants said, "[S]orry, that they will return my stuff if I don't take any further action." Patel added that four to six police officers were present when defendants made this statement. Ms. Becker, however, who was with Patel at all times after the lineup, does not remember any apology made by the defendants.

Both defendants testified on their own behalf and offered a matching alibi. According to defendants, they were at the home of Nick Abernathy and his wife at the time of the robbery. Also present at the Abernathy home that evening were Anita Ortiz, Adam Lopez, Evaristo Jiminez and his wife Lucy. At approximately 11:30 p.m., Jiminez asked to borrow defendant Mendiola's car, a black and white Chrysler, to bring his wife home. Mendiola allowed Jiminez to use his car. Defendants remained at the Abernathys' home until 2 a.m., and still Jiminez had not returned with the car. They then took a cab to Jiminez' home where they saw Mendiola's car parked outside. The police arrived shortly thereafter and arrested defendants.

After they were placed in a lineup at the police station, a plainclothes officer told the defendants that they had been identified by Patel.

According to Mendiola, the plainclothes officer told them "to at least go tell him [Patel] that we were sorry for what we did, and I told him I'm sorry because of what happened to him, not because I did it." Both defendants testified that they told Patel they were sorry for what happened to him, but neither defendant told Patel that they robbed him or promised to return his property. Both defendants said they did not rob Patel that evening.

OPINION

Defendants first contend that the trial court erred in denying their motion to suppress their statement of apology to Patel. In support of their motions to suppress this statement, both defendants stated in identical language and in conclusory fashion: "* * * that any statement or confession elicited from him [each defendant] was the direct result of mental coercion and was therefore involuntary." No factual allegations were provided to buttress this conclusion. Officer Battaglia, Ghanshyam Patel and Vivian Becker testified for the State in opposition to this motion; defendants, on the other hand, offered no evidence at the hearing. Instead, in their arguments before this court, defendants rely on the State's failure to call all material witnesses to testify at the hearing and that the circumstances surrounding the statement created mental coercion on the defendants as grounds for suppressing those statements.

■■ When the voluntary nature of a confession or statement is called into question by a motion to suppress, the State has the burden of proving that the confession or statement was voluntarily given. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 282 N.E.2d 712.) In addition, the State can discharge this burden only by producing all material witnesses connected with the controverted statement or explain their absence. (*People v. Armstrong.*) The test of the voluntary nature of a statement is "whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) This determination depends upon the totality of the circumstances, including the intensity of the interrogation, failure to warn of constitutional rights and defendant's age, experience and education. (*People v. Starling* (1978), 64 Ill. App. 3d 671, 381 N.E.2d 817.) In making this determination, the trial court need only be convinced by a preponderance of the evidence, not beyond a reasonable doubt, that the statement was voluntarily given. (*People v. Ybarra* (1977), 46 Ill. App. 3d 1049, 361 N.E.2d 678.) That determination will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Ybarra.*

■■ Initially, defendants maintain that the statements should have been suppressed because the State failed to call all material witnesses. The testimony indicated that defendants made this statement in the presence of Officer Battaglia, Investigator Fornelli, Ghanshyam Patel, Vivian Becker and four to six other police officers. These other police officers and Investigator Fornelli were not called to testify by the State at the hearing, and their absence was not explained by the State. We note that defendants and the State stipulated that if Investigator Fornelli were called to the stand he would testify that no coercion of any sort was exercised on defendants to make this statement. In their motions to suppress, both defendants failed to state specific facts supporting their claim of mental coercion. Consequently, the State was unable to determine in advance who would be a material witness to this question. Nonetheless, the State offered the testimony of Officer Battaglia who accounted for the entire time defendants were in custody until the statement was given. Also, Patel and Becker testified as to their own memory of this statement. Section 114—11(b) of the Criminal Code of Procedure of 1963 states that a motion to suppress statements must be "in writing and state facts showing wherein the confession is involuntary." (Ill. Rev. Stat. 1975, ch. 38, par. 114—11(b).) Given the defendants' failure to state the specific facts underlying the alleged coercion, the State cannot be expected to produce all material witnesses. (See *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672; *People v. Beamer* (1978), 59 Ill. App. 3d 855, 376 N.E.2d 368; *People v. Carpenter* (1976), 38 Ill. App. 3d 435, 347 N.E.2d 781; and *People v. Delk* (1976), 36 Ill. App. 3d 1027, 345 N.E.2d 197.) The trial court did not err in denying defendant's motion on this ground.

The defendants' second argument on this point is that circumstances surrounding their statements demonstrate an atmosphere of mental coercion. More specifically, they rely on these factors. They were young and inexperienced; the statement was made at approximately 4:30 a.m. and they had been up all night; they had not yet spoken to their parents; their testimony was that one of the police officers had told them to apologize; and several police officers were in the room when they made these statements. Against these factors must be weighed the testimony of Officer Battaglia, which reveals no coercion of any sort. In our view, the evidence raised a question of fact for the trial court. We can find nothing in the record which would allow us to substitute our judgment for that of the trial court. The trial court's decision was not against the manifest weight of the evidence.

Defendants next contend that the trial court erred in denying their motion to suppress identification evidence. In their motions to suppress,

they allege that the unnecessarily suggestive nature of the pretrial lineup requires suppression of any evidence of that lineup and of any in-court identifications. Four factors, according to defendants, render the pretrial lineup unnecessarily suggestive: (1) Patel and Becker viewed the lineup in each other's presence; (2) Officer Battaglia informed Patel prior to the lineup that he had three people from the area in custody for questioning; (3) defendants wore clothing in the lineup identical to that worn by Patel's assailants; and (4) the defendants were positioned at each end of the lineup.

In 1967, the United States Supreme Court in *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, decided that the conduct of out-of-court identification procedures may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to violate due process of law. (*Stovall v. Denno* (1967), 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972.) This determination is to be made in light of the totality of the circumstances. (*Stovall v. Denno.*) The unnecessarily suggestive out-of-court identification was deemed inadmissible. (*Stovall v. Denno.*) This due process protection against mistaken identification evidence continued in *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967. In that case, evidence of the out-of-court identification had been suppressed consistent with the teachings of *Stovall.* The question before the court in *Simmons* was the admissibility of the in-court identification which was not itself unnecessarily suggestive. The court held that the in-court identification was inadmissible if the pretrial procedure had been "so impermissibly suggestive as to give rise to a *very substantial likelihood of irreparable misidentification.*" (Emphasis added.) (*Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.) In these situations, the stress was on the impact of the suggestiveness on the in-court identification, and not on the conduct of the pretrial procedure itself. Thus, if the in-court identification was reliable in the totality of the circumstances despite the unnecessarily suggestive identification, then it is admissible.

In *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375, the court adopted a single analysis for both out-of-court identifications and in-court identifications. The court found the "central question" to be "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." (*Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.) Applying the factors enumerated in that case, the court found "no substantial likelihood of misidentification." (*Neil v. Biggers* (1972), 409 U.S. 188, 201, 34 L. Ed. 2d 401, 412, 93 S. Ct. 375, 383.) This analysis was given final form by the court in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, where the court rejected a *per se* rule of

exclusion of identification evidence because of the suggestive nature of the identification procedure. The *Manson* court stated unequivocally:

> "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations. The factors to be considered are set out in *Biggers*, 409 U.S., at 199-200. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253; see also *People v. Tedder* (1980), 83 Ill. App. 3d 874, 404 N.E.2d 437.)

Given this state of the law, the first step of analysis is an examination of the pretrial identification procedure for elements of suggestiveness. If we find the pretrial identification to be free of suggestive influence upon the witness, and thus reliable, then evidence of both the pretrial procedure and the in-court identification are admissible. See *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

Defendants first point to the fact that Patel and Becker viewed the lineup together as an element of suggestiveness. The presence of more than one witness at a lineup at one time has been severely criticized as "a procedure said to be fraught with dangers of suggestion." (*United States ex rel. Pierce v. Cannon* (7th Cir. 1974), 508 F.2d 197, 200, *cert. denied* (1975), 423 U.S. 841, 46 L. Ed. 2d 61, 96 S. Ct. 74.) We join in that criticism. Such a procedure creates a form of group pressure upon later witnesses to join the identification made by the first witness to view the lineup. This reasoning, however, is not applicable here. In the instant case, Ms. Becker viewed the lineup first and failed to make an identification. Patel then viewed the lineup and identified the defendants. Since Ms. Becker failed to make an identification, there existed no group or peer pressure on Patel to tailor his opinion to that of the witness viewing the lineup ahead of him. Although this practice is to be condemned, it did not carry a suggestive impact here. See *United States ex rel. Clark v. Fike* (7th Cir. 1976), 538 F.2d 750, *cert. denied* (1977), 429 U.S. 1064, 50 L. Ed. 2d 781, 97 S. Ct. 791.

■■ Defendants next refer to Officer Battaglia's statement to Patel informing him that he had three people from the area in custody for questioning. This statement did not suggest any action Patel should

undertake, but only stated the obvious. If the police did not have reason to believe one member of the lineup was the criminal they would not conduct a lineup. Similar statements have been found to be free of suggestive impact. See *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915; *People v. Madden* (1977), 52 Ill. App. 3d 951, 368 N.E.2d 384.

■■ Defendants also claim that since the clothing they wore at the lineup was the same as that described by Patel as worn by the assailants, Patel necessarily identified them. After the robbery, Patel informed the police that the man with the shotgun wore a beige coat and the man with the automatic pistol wore a black leather coat. At the lineup defendant Lopez wore a beige coat and defendant Mendiola wore a black leather coat. Apparently, defendants were arrested with these clothes, and there is no evidence that the police forced them to wear this clothing. Absent evidence that defendants were required by the police to wear particular clothing which was said to be worn by the criminals, there can be no claim of impermissible suggestiveness. *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 369 N.E.2d 377; *People v. Madden* (1977), 52 Ill. App. 3d 951, 368 N.E.2d 384; and *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999.

■■ Finally defendants point to their positions at each end of the lineup as indicative of its suggestive nature. In support of this conclusion, defendants have offered no case law and no reasoning. This does not surprise us for we have found no valid reason behind defendants' argument. In conclusion, we find the out-of-court identification conducted here to be free of suggestive impact, and thus evidence of the lineup and the in-court identification was properly admitted.

Defendants' final argument is that the State failed to prove them guilty beyond a reasonable doubt. In determining whether a criminal conviction should be disturbed for failure to prove the defendant guilty beyond a reasonable doubt, elementary principles of analysis have been previously provided by this court:

"A court of review will not set aside a criminal conviction unless the evidence presented at trial is so improbable or so palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 376 N.E.2d 666.) The trial judge in a bench trial is to determine the credibility of the witnesses, the weight to be afforded their testimony, and resolve any conflicts in testimony. (*People v. Glaze* (1977), 48 Ill. App. 3d 523, 362 N.E.2d 1827.) Any discrepancies or conflicts in testimony affect only the weight to be given the testimony, and the trier of fact is free to accept or reject as much or as little as it pleases of a witness' testimony. (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) Where the evidence is merely conflicting, a court

of review will not disturb the judgment of the trier of fact. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733." (*People v. Morris* (1979), 79 Ill. App. 3d 318, 325, 398 N.E.2d 38, 44.)

With this framework in mind, we turn to the facts before us.

The robbery was committed behind the Convenient Food Store. Ghanshyam Patel testified that the entire robbery lasted two minutes. During that time, he had adequate opportunity to observe the defendants from a distance of about two feet. According to Officer Battaglia and Patel, the area behind the store was illuminated by the lights in the front of the store, an overhead light on the building next door, street lights and lights from a nearby "El" station. Patel testified that Lopez held a sawed-off shotgun during the robbery. Approximately three hours after the robbery, Patel identified defendant in a nonsuggestive lineup. Moreover, Patel again identified defendants at trial. Defendants spoke to Patel, after the lineup, and told him they were sorry and would return his property. Finally, defendant Mendiola's car, a black and white Chrysler, was seen at the scene of the crime by Officer Battaglia. In light of this evidence, we find that defendants were convicted beyond a reasonable doubt.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.